UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.R. HORTON, INC. – SACRAMENTO, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation; AIG SPECIALTY INSURANCE COMPANY, f.k.a. AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, an Illinois corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | No. 14-cv-2155-KJM-DAD<br><br><br>ORDER |

      Competing motions for summary judgment filed by plaintiff and defendants are currently pending before the court. (ECF Nos. 20, 21, 22.) The court held a hearing on the motions on February 27, 2015, at which John McLeod appeared for plaintiff D.R. Horton, Inc. (Horton), and Andrew McCloskey appeared for defendants National Union Fire Insurance Company of Pittsburgh (National Union) and AIG Specialty Insurance Company (AIG) (collectively, defendants). As explained below, the court GRANTS each motion.

/////

I.     UNDISPUTED FACTS

Through the instant lawsuit, Horton seeks to recover from defendants the sums Horton paid to settle another lawsuit. Horton, a home builder, was involved in the construction of an apartment complex in Rocklin, California. (First Am. Compl. (Compl.) ¶ 18, ECF No. 10; ECF No. 27-1 ¶ 13.) In March 2011, the owners' association for that complex filed a lawsuit against Horton, alleging construction defects (Underlying Action).[1] (Compl. ¶ 19; ECF No. 27-1 ¶ 13.) Horton notified defendants of that lawsuit and asked defendants to defend and indemnify it under the insurance policies at issue here. (Compl. ¶ 20; ECF No. 27-1 ¶ 16.) National Union agreed to defend Horton "subject to a reservation of rights sent on February 29, 2012." (ECF No. 27-1 ¶ 18.) AIG refused to defend Horton. (ECF No. 28-1 ¶ 11.)

In November 2012, Horton negotiated a "tentative" settlement of the claims in the Underlying Action for the amount of $3.2 million. (ECF No. 27-1 ¶ 20.) In August 2013, Horton sent a letter to National Union's counsel, requesting that it fund $1.04 million of the $3.2 million settlement. (*Id.* ¶ 26.) In the same month, National Union and AIG responded to that request by declining to provide the requested funds. (*Id.* ¶ 27; ECF No. 28-1 ¶ 14.) In December 2013, Horton finalized the settlement agreement in the Underlying Action in the amount of $3.05 million. (ECF No. 27-1 ¶ 28; ECF No. 28-1 ¶ 15.) The settlement amount was satisfied by funds Horton received from various sources: certain subcontractors provided $615,000; Great Lakes Reinsurance, LLC (U.K.) (GLUK) provided $1.6 million; and Horton itself contributed $835,000. (ECF No. 28-1 ¶ 15.) GLUK had provided second layer excess policies to Horton, which applied in excess of AIG's policies. (Compl. ¶ 17.)

The insurance policies at issue in this case are first-layer umbrella policies and include commercial umbrella liability insurance issued by National Union, policy no. 7018605

---

[1] The Underlying Action was captioned *Rocklin Park Place Condominium Owners Association v. D.R. Horton Inc. – Sacramento*, No. SCV0028920 (Placer Cnty. Super. Ct. 2011). At Horton's request (ECF No. 22-6), the court takes judicial notice of the filings in that case because they are directly relevant to the issues in this case. *See U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

(effective July 1, 2000 to July 1, 2001) (00-01 Policy or National Union Policy), and a commercial umbrella liability insurance issued by AIG, policy no. 7411565 (effective July 1, 2001 to July 1, 2002) (01-02 Policy or AIG Policy) (collectively, the Policies).  (ECF No. 27-1 ¶ 1; ECF No. 28-1 ¶ 1.)  As noted, second layer excess policies were issued by GLUK: policy nos. 01-UK-CT-0000001-00 (effective July 1, 2000 to July 1, 2001) and 01-UK-CT-0000001-01 (effective July 1, 2001 to July 1, 2002) (collectively, GLUK Policies).  In addition, Horton had commercial general liability insurance from Admiral Insurance Company (Admiral), policy nos. A00AG08810 (effective July 1, 2000 to July 1, 2001) and A01AG10939 (effective July 1, 2001 to July 1, 2002) (collectively, Admiral Policies), affording Horton aggregate limits of $2 million.  (ECF No. 27-1 ¶ 3.)  It is undisputed that the first policy issued by Admiral had been exhausted at the time Horton commenced this lawsuit.  (*Id.* ¶ 4.)

Horton commenced this action in Placer County Superior Court on August 15, 2014. (ECF No. 1-1.)  Defendants removed the action to this court, asserting diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332.  (ECF No. 1.)  The first amended complaint, the operative complaint here, alleges nine claims against all defendants: (1) breach of contract for failure to defend; (2) breach of contract for failure to settle; (3) breach of contract for failure to indemnify; (4) breach of the implied covenant of good faith and fair dealing for failure to defend; (5) breach of the implied covenant of good faith and fair dealing for failure to settle; (6) breach of the implied covenant of good faith and fair dealing for failure to indemnify; (7) equitable subrogation; (8) equitable contribution; and (9) equitable indemnity.  (*See generally* ECF No. 10.)

II.     LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Partial summary judgment may be granted on motion of either party for adjudication of a particular claim.  *Id.*  The standards and procedures are the same as for summary judgment.  *Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 860 F. Supp. 1448, 1451 (C.D. Cal. 1993).

/////

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[3]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . ; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no *genuine* issue of *material* fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

/////

---

[3] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010 amendments.

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010). However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

This standard does not change when the parties file cross-motions for summary judgment: the court must apply the same standard and rule to each motion independently because the granting of one motion does not necessarily translate into the denial of the other unless the parties rely on the same legal theories and same set of material facts. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010).

III.    INSURANCE POLICIES

    A. General Rules of Interpretation

Because this is a diversity action, this court applies the substantive law of California and federal procedural law. *See Bell Lavalin, Inc. v. Simcoe & Erie Gen. Ins. Co.*, 61 F.3d 742, 745 (9th Cir. 1995). Under California law, contract interpretation is a question of law unless the interpretation depends on the credibility of extrinsic evidence. *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 688 (2010). Courts interpret insurance policies utilizing the same interpretation rules as for other contracts. *Id.* The aim is to effectuate the contracting parties' mutual intention at the time of the contract's formation. *Id.* Courts ascertain that intention from the parties' writing and also consider the circumstances surrounding the contract's formation and the contract's subject matter. *Id.* In doing so, courts read the contract as a whole

and "interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation." *Id.* Unless the parties use words in a technical sense or a special meaning is accorded to them by usage, courts interpret words in accordance with their plain meaning, as laypeople ordinarily would. *Id.* If the contract's language is clear and involves no ambiguities, the plain meaning governs. *Id.* "Policy language is ambiguous if it is susceptible of more than one reasonable interpretation in the context of the policy as a whole. Whether policy language is ambiguous is a question of law . . . . Any ambiguity must be resolved in a manner consistent with the objectively reasonable expectations of the insured in light of the nature and kind of risks covered by the policy." *Id.* In addition, if there is a provision limiting "coverage reasonably expected by the insured," it must be "conspicuous, plain, and clear to be effective." *Id.*

The Ninth Circuit has summarized these rules of contract interpretation as requiring a three-step process:

> The first step is to examine the clear and explicit meanings of the terms as used in their ordinary and popular sense. In assessing the terms' meanings, we may not take individual terms out of context: Language in a contract must be construed in the context of that instrument as a whole . . . and cannot be found to be ambiguous in the abstract. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.
>
> If (and only if) a term is found to be ambiguous after undertaking the first step of the analysis, the court then proceeds to the second step and resolves the ambiguity by looking to the expectations of a reasonable insured. Under California law, an insurance policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable.
>
> Finally, if the ambiguity still remains, it is construed against the party who caused the ambiguity to exist. In the insurance context, this is almost always the insurer, as the California Supreme Court has held that ambiguities are generally resolved in favor of coverage, and that the courts are to generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured.

*In re K F Dairies, Inc. & Affiliates*, 224 F.3d 922, 925–26 (9th Cir. 2000) (internal citation and quotation marks omitted).

/////

B.  Terminology

The parties use various terms of art in their filings: "primary" as opposed to "excess" and "umbrella" insurance.  Generally speaking, these terms refer to the order in which insurers must pay for an insured's loss.  *See N. Am. Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 177 Cal. App. 4th 272, 291–92 (2009).  Primary insurance provides immediate coverage "upon the 'occurrence' of a 'loss' or the 'happening' of an 'event' giving rise to liability.  It is defined as 'insurance coverage whereby, *under the terms of the policy,* liability attaches *immediately* upon the happening of the occurrence that gives rise to liability."  *Id.* at 291 (emphases in original).  Generally, a primary insurer has "the *primary* duty to defend and to indemnify the insured, unless otherwise excused or excluded by specific policy language."  *Id.* (emphasis in original).

An excess insurance policy is a type of a secondary policy.  *Id.*  The excess insurance policy insurer is not required to respond to a claim until the limits of the primary policy have been exhausted.  *Id.*  In some situations, excess policies may be layered over other secondary policies.  *See Signal Companies, Inc. v. Harbor* Ins. Co., 27 Cal. 3d 359, 366 (1980).

An umbrella insurance policy is another type of secondary insurance.  "The term 'umbrella' coverage refers to coverage that 'drops down' to cover occurrences that are not covered by [any] underlying policies of insurance."  *Powerine Oil Co. v. Superior Court*, 37 Cal. 4th 377, 402 n.9 (2005).  "In the ordinary case, excess or umbrella coverages are designed to pick up where the primary insurance coverage leaves off, providing an excess layer of coverage above the limit of the primary policy," and to "protect against gaps in coverage."  *Garamendi v. Mission Ins. Co.*, 131 Cal. App. 4th 30, 46 (2005) (internal quotation marks omitted).  "[U]mbrella coverages, almost without dispute, are regarded as true excess over and above any type of primary coverage, excess provisions arising in any manner, or escape clauses."  *Cont'l Ins. Co. v. Lexington Ins. Co.*, 55 Cal. App. 4th 637, 647 (1997).

IV.  DISCUSSION

A.  National Union's Motion for Partial Summary Judgment

After hearing, on May 28, 2015, the parties filed two stipulations.  (ECF Nos. 37, 38.)  According to the stipulations, Horton agrees to dismiss National Union from this action with

7

1  prejudice.  (ECF No. 37 at 2.)  The parties also stipulate to National Union's withdrawing its
2  motion for partial summary judgment in its entirety.  (ECF No. 38 at 2.)  The court hereby
3  approves the parties' stipulations.  National Union is dismissed from this action with prejudice,
4  and National Union's motion for partial summary judgment is withdrawn.

5        B.      <u>AIG's Motion for Partial Summary Judgment</u>

6        AIG moves for partial summary judgment on Horton's first six claims.  (ECF No.
7  21.)  Specifically, AIG argues Horton's claims fail as a matter of law because under its insurance
8  policy, coverage attaches only after Horton satisfies a $1.5 million Self-Insured Retention (SIR),
9  which AIG says Horton did not satisfy.  (*Id.* at 1.)  In its motion, AIG "seeks an adjudication that
10 . . . Horton has the obligation to satisfy the [SIR] before the applicable excess coverage attaches
11 . . . ."  (*Id.*)

12  Horton counters AIG's SIR requirement is unenforceable because "it was not
13 conspicuous, plain and clear."  (ECF No 28 at 7.)  Alternatively, Horton seeks a continuance to
14 conduct further discovery.  (*Id.* at 15–16.)  Finally, Horton argues, assuming the SIR is
15 enforceable, that requirement was satisfied by the combined settlement payments it made in the
16 Underlying Action.  (*Id.* at 19–20.)  Considering the parties' arguments, the court finds AIG's
17 motion should be denied, as explained below.

18        The AIG Policy's declaration page reads as follows:
19        ITEM 3.    LIMITS OF INSURANCE:
20             The Limits of Insurance, subject to all the terms of this policy, are:
21             A.  $25,000,000      Each Occurrence
22             B.  $25,000,000      General Aggregate . . .
23             . . .
24             D.  $0      Self Insured Retention
25  (ECF No. 21-5, Ex. A at 2 (Commercial Umbrella Declarations).)
26  /////
27  /////
28  /////

8

On a separate page titled "Schedule of Underlying Insurance," the AIG Policy provides as follows, in relevant part:

> TYPE OF POLICY
> OR COVERAGE                    LIMITS
>
> GENERAL LIABILITY              $1,500,000
>                                S.I.R. EACH AND EVERY OCCURRENCE
>                                INDEMNITY ONLY
>
>                                . . . .

(*Id.* at 4.)

Under the heading "Insuring Agreements" later in the agreement, the AIG Policy provides as follows, in relevant part:

> II.  Defense
>
>   A. We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:
>
>     1. The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies; or
>
>     2. Damages are sought for . . . Property Damage . . . covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

(*Id.* at 19.)

As is evident from the latter passage, the AIG Policy offered both excess and umbrella provisions; subparagraph 1 being the excess provision and subparagraph 2 being the umbrella provision, as both terms are defined above. Based on the above quoted provisions, AIG argues "[s]ince the retention was never exhausted, no duty to defend ever arose under the AIG . . . Policy." (ECF No. 21-1 at 9.) But AIG has not met its burden on summary judgment of showing that the SIR provision limits the coverage reasonably expected by Horton.

As noted above, "[t]he interpretation of a contract, including the resolution of any ambiguity, is solely a judicial function, unless the interpretation turns on the credibility of

9

extrinsic evidence." *GGIS Ins. Servs., Inc. v. Superior Court*, 168 Cal. App. 4th 1493, 1507 (2008) (citing *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965)). Under the framework for interpreting insurance policies, exclusions and limitations of coverage must be conspicuous, plain, and clear to be enforceable. *See Travelers Prop. Cas. Co. of Am. v. Superior Court*, 215 Cal. App. 4th 561, 575 (2013). "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. . . . any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." *Id.* (internal quotation marks omitted). Consistent with these directives, "any such limitation must be placed and printed so that it will attract the reader's attention. . . . [and] must be stated precisely and understandably, in words that are part of the working vocabulary of the average layperson." *Id.* The burden of making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer." *Id.* at 575.

The principles applicable to interpreting coverage exclusions and limitations come into play "only when the insured has a reasonable expectation of coverage[,]" defined by the language of the policy. *Id.*; *see also Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1214 (2004); *Spangle v. Farmers Ins. Exch.*, 166 Cal. App. 4th 560, 569 (2008) ("The best indicator of an insured's reasonable expectation of coverage is, of course, the language of the insurance policy."). Whether an exclusion or limitation is "conspicuous, plain and clear" is a question of law. *Sprinkles v. Associated Indem. Corp.*, 188 Cal. App. 4th 69, 77 (2010).

Here, preliminarily, Horton had a reasonable expectation of coverage because the declaration page of the AIG Policy, in expressly listing the limits of the policy, provides that the limits of SIR are "$0." (ECF No. 21-5, Ex. A at 2.) The plain reading of this page is that the insured bears no portion of a loss otherwise covered by the policy. That is, the insured has zero initial responsibility that must be satisfied before there is any coverage under the policy. But the parties have not specifically raised arguments as to whether there was a reasonable expectation of coverage. Rather, they have concentrated their arguments on whether the limitation was conspicuous, plain and clear. (ECF No. 30 at 2–4.) The court thus "assumes a reasonable

/////

1   expectation of coverage and turn[s] to whether the limitation is conspicuous, plain and clear."

2   *Travelers Prop. Cas. Co. of Am. v. Superior Court*, 215 Cal. App. 4th 561, 575 (2013).

3           First, the court finds the SIR limitation is conspicuous because it is written in
4   capital letters and is not placed on an overcrowded page.  But the limitation is not plain and clear.
5   On the one hand, the declaration page expressly provides that there are no limits applicable to
6   SIR.  (ECF No. 21-5, Ex. A at 2.)  But the prefatory language says the limits are "subject to all
7   the terms of this policy."  (*Id.*)  Those other terms include the "Schedule of Underlying Insurance,
8   which provides that general liability limits are "$1,500,000."  (*Id.* at 4.)  Immediately below and
9   on the same line as this dollar amount, the Schedule includes the following language: "S.I.R.
10  EACH AND EVERY OCCURRENCE" "INDEMNITY ONLY."  (*Id.*)  On its face, this latter
11  provision of the schedule contradicts the information on the declaration page.  In addition, the
12  phrase "indemnity only" suggests the limitation applies to indemnity claims only and not to the
13  duty to defend as AIG argues in saying the policy "clearly requires exhaustion of the limits
14  specified therein before AIG . . . has any duty to defend."  (ECF No. 21-1 at 8.)

15          Contrary to AIG's argument, the AIG Policy, read as one document, does not
16  clearly specify that the SIR on the declaration page applies to the umbrella provision only and
17  that the $1.5 million SIR applies to the excess provision.  Accordingly, AIG has not met its
18  burden of showing a plain and clear coverage limitation as a matter of law.

19          AIG's motion for partial summary judgment is DENIED.

20      C.    <u>Horton's Motion for Partial Summary Judgment</u>

21          In light of Horton's stipulated dismissal of National Union, the court addresses
22  Horton's motion directed against AIG only.

23          Horton's motion, thus narrowed, argues (1) the no voluntary payment (NVP) and
24  "no action" provisions of the AIG Policy are unenforceable; and (2) Horton did not violate any
25  provisions of the agreement by settling the Underlying Action without AIG's consent.  (ECF No.
26  22 at 1.)

27  /////

28  /////

1. The NVP Provision of the AIG Policy

Horton argues that because AIG refused to defend Horton in the Underlying Action, AIG has lost the right to assert the NVP provision. (ECF No. 22-1 at 8, 18-19.)

"The general validity of no-voluntary-payment provisions in liability insurance policies is well-established." *Insua v. Scottsdale Ins. Co.*, 104 Cal. App. 4th 737, 742 (2002). The purpose of an NVP clause is "to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims . . . ." *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.*, 3 Cal. 3d 434, 449 (1970) (ellipsis in original). Such clauses "ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim." *Jamestown Builders, Inc. v. Gen. Star Indem. Co.*, 77 Cal. App. 4th 341, 346 (1999). An insurer need not reimburse its insured for amounts unilaterally paid to settle a claim without notice to the insurer in violation of an NVP clause. *Id.* at 350. However, the rule is subject to exceptions: an NVP clause does not relieve an insurer's liability when there is (1) an economic necessity, (2) a mistake, or (3) the insurer refuses to defend. *See Low v. Golden Eagle Ins. Co.*, 110 Cal. App. 4th 1532, 1545–47 (2003).

Here, it is undisputed that AIG refused to defend Horton. But as explained below, Horton has not met its burden on summary judgment to show there is no genuine dispute that AIG had a duty to defend and that duty was triggered. Accordingly, this court cannot enter summary judgment in Horton's favor concerning the NVP provision of the AIG Policy.

2. The "No Action" Provision of the AIG Policy

"No action" clauses are intended to prevent actions by insureds against the insurer until damages have been determined by a final judgment or settlement. *See Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 233 (9th Cir. 1989). Such clauses also prevent an insured from settling directly with the injured party without the insurer's consent before a final judgment. The insurer can decide whether or not to settle so long as it is providing a defense. *See Safeco Ins. Co.*, 71 Cal. App. 4th at 787. If an insurer refuses to defend a third party claim against its insured, it may be estopped from asserting the "no action" clause. In such

12

cases, the insured may settle the underlying case in good faith and then seek a claim against the insurer to recover the amount of the settlement. *See Clark v. Bellefonte Ins. Co.*, 113 Cal. App. 3d 326, 335 (1980). As noted above, the burden is on the insured to tender a defense. *See Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal. App. 4th 966, 971 (2000). And the duty to defend arises when the insured tenders defense. *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993).

Here, it is undisputed that AIG did not defend Horton in the Underlying Action. But Horton has not made any argument that AIG had a duty to defend Horton. Because Horton has not met its burden on summary judgment to show AIG had such a duty and that the duty was triggered by the Underlying Action, this court cannot enter summary judgment in Horton's favor concerning the "no action" provision of the AIG policy. Accordingly, the court DENIES Horton's motion for partial summary judgment.

V.   CONCLUSION

For the foregoing reasons the court orders as follows:

1. National Union is DISMISSED from this action with prejudice, and National Union's motion for partial summary judgment is WITHDRAWN.
2. AIG's motion for partial summary judgment is DENIED.
3. Horton's motion for partial summary judgment against National Union is WITHDRAWN.
4. Horton's motion for partial summary judgment against AIG is DENIED.
5. This order resolves ECF Nos. 20, 21, 22.
6. As proposed by the parties' stipulation to participate in a private mediation (ECF No. 43), the parties are directed to complete a private mediation within seventy-five (75) days of the date of this order. The parties shall file a joint status report setting forth the results of the mediation and, if the case has not settled, proposing a date for a status conference.

/////

/////

7. The status conference set for October 1, 2015 is VACATED, to be reset after the mediation referenced above.

IT IS SO ORDERED

DATED: September 1, 2015.

_____
UNITED STATES DISTRICT JUDGE